RECEIVED
IN LAKE CHARLES, LA

MAR 3 1 2009

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**LAKE CHARLES DIVISION**

| | | |
|---|---|---|
| **CHRISTOPHER S. CALLAHAN** | : | **DOCKET NO. 6:06 CV 0561** |
| **VS.** | : | **JUDGE MINALDI** |
| **GULF LOGISTICS, LLC ET AL.** | : | **MAGISTRATE JUDGE HILL** |

## MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment, filed by defendants Diamond Offshore Drilling, Inc., Diamond Offshore Services Company, Diamond Offshore Management Company, and Diamond Offshore Company (hereinafter collectively "Diamond") [doc. 57].[1]

Before the Court is also a Motion for Summary Judgment, filed by defendants Gulf Logistics, LLC and Gulf Logistics Operating, Inc. (hereinafter collectively "Gulf Logistics") [doc. 51]. Gulf Logistics filed a Reply [doc. 95]. Mr. Callahan filed a Sur-Reply [doc. 89]. Gulf Logistics filed a Reply brief to Mr. Callahan's Sur-Reply [doc. 97].

Before the Court is also a Motion For Summary Judgment, filed by defendants LLOG Exploration Company, LLC, LLOG Exploration and Production Company, and LLOG Exploration Texas LP [doc. 48]. The fourth LLOG entity, LLOG Exploration Offshore, Inc. (hereinafter "LLOG Offshore"), filed a separate Motion For Summary Judgment [doc. 56]. All four LLOG entities filed a collective Reply [doc. 84].

This Court shall address all four motions for summary judgment in this Memorandum

---

[1] The plaintiff, Christopher Callahan, filed an Opposition addressing all four motions for summary judgment [doc. 83].

Ruling.

## FACTS

Mr. Callahan filed suit after allegedly sustaining bodily injuries on April 10, 2005 while he was employed by Cooper Cameron Corporation as a field service technician aboard the M/V MS. NANCY.[2] Mr. Callahan claims to have sustained bodily injuries while standing on the M/V MS. NANCY when the vessel lunged due to choppy seas.[3]

On April 10, 2005, the M/V MS. NANCY was owned by defendant Gulf Logistics (hereinafter "GL") and manned by Gulf Logistics Operations, Inc. (hereinafter "GLO"). All four LLOG entities are listed as parties to a blanket time charter agreement with C&G Boats, Inc. (hereinafter "C&G").[4] C&G furnished the M/V MS. NANCY to the LLOG entities pursuant to a master time charter that C&G entered into with GL on April 14, 2000.[5] Pursuant to the blanket time charter agreement, C&G was obligated to "operate, navigate, victual and supply each vessel" and the voyages shall be "subject to the sole right of [C&G] or the captain of each vessel to determine whether the movement may be safely undertaken, with the captain always being in charge."[6] The master time charter between C&G and GL essentially imposed the same obligations upon GL.[7]

The M/V MS. NANCY transported Mr. Callahan from Berwick, Louisiana to the mobile

---

[2] Def.'s Statement of Uncontested Material Facts ¶ 1 [doc. 57-2].

[3] Pl.'s Ex. A (Callahan Dep.). The evidence indicates the waves were anywhere from ten feet, as stated in the Diamond accident report, to fifteen to eighteen feet, as stated in Mr. Callahan's deposition.

[4] Def.'s Ex. D-1 [doc. 56-7].

[5] Def.'s Ex. E (GL Interrogatories).

[6] Def.'s Ex. D-1 [doc. 56-7].

[7] See Def.'s Mot. For Summ. J. [doc. 56-3], at 5; see also Def.'s Ex. D [doc. 56-8].

drilling unit OCEAN SPARTAN, which was located within the leasehold designated OCS-G24872 in South Marsh Island Block No. 102 in the Gulf of Mexico.[8] The OCEAN SPARTAN was conducting workover and completion operations to a well connected to a fixed platform that was owned and operated by LLOG Offshore.[9] The four LLOG entities entered into a contract with Diamond Offshore Company, called "Domestic Daywork Drilling Contract–Offshore," whereby the Diamond Offshore Company was to drill the well LLOG Offshore operated.[10]

The four LLOG entities had a master service contract with Expeditors & Production Services Co., Inc. (hereinafter "EPS").[11] Pursuant to this contract, EPS provided personnel to operate the shore base from where the MV/MS. NANCY was dispatched.[12] The contract between the LLOG entities and EPS classifies EPS as an independent contractor.[13]

The LLOG entities had a master service contract with Eagle Consulting, LLC (hereinafter "Eagle"), under which Eagle provided two drilling consultants to oversee the progress of workover and completion operations in connection with the well A-2.[14] This work was performed from the OCEAN SPARTAN. The contract between the LLOG entities and Eagle classifies Eagle as an independent contractor.[15]

---

[8] Def.'s Statement of Uncontested Material Facts ¶ 2 [doc. 48-2].

[9] *Id.* ¶ 3. Mr. Callahan disputes that this platform was owned only by LLOG Exploration Offshore, Inc. This point is addressed later in the opinion.

[10] Pl.'s Ex. D.

[11] Def.'s Ex. C [doc. 56-6] (Ducote Aff.)

[12] Def.'s Ex. C-1 [doc. 56-6].

[13] *Id.*

[14] Def.'s Ex. B [doc. 56] (Ducote Aff.)

[15] Def.'s Ex. B-1 [doc. 56-5].

LLOG Exploration Company, LLC, LLOG Exploration and Production Company, and LLOG Exploration Texas LP did not have any employees present on the M/V MS. NANCY at the time of the alleged accident, or any employee or other individual present on the OCEAN SPARTAN at the time of the incident.[16] LLOG Exploration Company, LLC, LLOG Exploration and Production Company, and LLOG Exploration Texas LP assert that at all material times they did not possess any interest in the leasehold designated OCS-G24872.[17] LLOG Exploration Company, LLC, LLOG Exploration and Production Company, and LLOG Exploration Texas LP further state that they did not possess any ownership in the fixed platform situated in the leasehold designated OCS-G24872.[18] LLOG Exploration Company, LLC, LLOG Exploration and Production Company, and LLOG Exploration Texas LP also assert that they have not retained any contractor to conduct operations in connection with the fixed platform and well with the leasehold designated OCS-G24872.[19] Lastly, LLOG Exploration Company, LLC, LLOG Exploration and Production Company, and LLOG Exploration Texas LP state they did not have an employee present within the leasehold designated OCS-G24872.[20] LLOG attached three affidavits from Kemberlia K. Ducote, the Secretary of LLOG Exploration Company, LLC, LLOG Exploration and Production Company, and LLOG Exploration Texas LP, supporting the assertions in their collective Statement of Uncontested Material Facts.[21]

LLOG Offshore also states that it did not have any employee or individual present on either

---

[16] Def.'s Exs. A-C [doc. 48] (Ducote Affs.)

[17] Def.'s Exs. A-C [doc. 48] (Ducote Affs.)

[18] *Id.*

[19] *Id.* ¶ 7.

[20] *Id.* ¶ 8.

[21] Def.'s Exs. A-C.

4

vessel or at the dispatch facility, was not in communication with any person on the M/V MS. NANCY or the OCEAN SPARTAN, or EPS, C&G, or Eagle regarding the transport of personnel, but does not provide competent summary judgment evidence to support this assertion.[22] Lastly, LLOG Offshore states that it did not participate in the dispatching of the M/V MS. NANCY on April 10, 2005, or the operation, navigation, or management of either the M/V MS. NANCY or the OCEAN SPARTAN, but does not present any competent summary judgment evidence to support this assertion.[23]

Mr. Callahan argues that all four LLOG entities had an interest because the master service agreements and time charterer contracts list all four LLOG entities.[24] Indeed, the Blanket Time Agreement with C&G lists all four LLOG companies,[25] as does the master service agreement with EPS,[26] and the master service agreement with Eagle.[27] LLOG Offshore attaches its Application for Permit to Modify, filed with the United States Department of the Interior, Minerals Management Service "for the purpose of conducting workover and completion operations" to the A-2 well on the leasehold designated OCS-G24872.[28] The affidavit further states that LLOG Offshore was the operator of the fixed platform to which the A-2 well was affixed on April 10, 2005.[29] LLOG

---

[22] Def.'s Mem. in Support of Mot. for Summ. J. [doc. 56-3], at 11.

[23] Id.

[24] Pl.'s Ex. C.

[25] Def.'s Ex. D-1 [doc. 56-7].

[26] Def.'s Ex. C-1 [doc. 56-6].

[27] Def.'s Ex. B-1 [doc. 56-5].

[28] Def.'s Ex. A [doc. 56-4].

[29] Id.

Offshore submits this evidence to demonstrate that it is the sole LLOG entity with an interest in this matter.

At all material times, Diamond owned and manned the OCEAN SPARTAN.[30] At the time of the alleged accident, no part of the OCEAN SPARTAN's crane, load line, or personnel basket was in the vicinity of the M/V MS. NANCY.[31] No one instructed Mr. Callahan to go onto the back deck of the MS. NANCY, where the alleged incident occurred.[32] Mr. Callahan testified that he went onto the back deck, despite concluding the seas were "unsafe."[33]

Mr. Callahan states that he boarded the crew boat on the afternoon of April 10, 2005, and the weather was "breezy" but "not bad."[34] Mr. Callahan further states that he was awoken between 10 p.m. and midnight when they arrived at the platform.[35] Mr. Callahan states that the deckhand informed him they were ready to offload, at which point he made his way to the rear deck, where he was subsequently injured.[36] Mr. Callahan's deposition testimony states that no one instructed him to enter the back deck of the MS. NANCY, and that he made that decision despite his own conclusion that the seas were "unsafe."[37] At the time of the alleged accident, the personnel basket

---

[30] Diamond's Statement of Uncontested Material Facts ¶ 5.

[31] Def.'s Ex. A (Callahan Dep.)

[32] *Id.*

[33] *Id.*

[34] Pl.'s Ex. B (Callahan Aff.)

[35] *Id.*

[36] *Id.*

[37] *See* Diamond's Ex. A (Callahan Dep.), p. 108-09.

was still on the M/V OCEAN SPARTAN.[38]

Mr. Callahan has made "thousands" of personnel basket transfers in the course of his career.[39] Mr. Callahan's employer, Cooper Cameron, has a "stop work" policy that permits employees to cease working if they find the conditions to be unsafe.[40] Mr. Callahan has used this policy before, and he was neither fired nor demoted for doing so.[41] Mr. Callahan never discussed with anyone whether it was safe to execute a personnel basket transfer, and that he himself believed it was "safe enough" to execute such a transfer.[42] Following his injury, he completed a successful personnel basket transfer.[43]

## **RULE 56(f) RELIEF**

In addition to arguing that the summary judgment motion should be denied, Mr. Callahan alternatively argues that the summary judgment motion is premature. Mr. Callahan filed this case on March 31, 2006. The motion for summary judgment was filed on March 11, 2008. On July 11, 2008, Mr. Callahan was granted until September 30, 2008, to file his Opposition because he needed additional time for discovery [doc. 79]. He then sought and was granted a second extension, until October 31, 2008, for the same reason [doc. 81]. A bench trial was set for November 17, 2008, but was continued without date on May 19, 2008.

Pursuant to Fed. R. Civ. P. 56(f), the non-moving party may request that the court postpone

---

[38] *Id.* at 107-08.

[39] Gulf Logistic's Ex. A (Callahan Dep.), p. 62.

[40] *Id.* at 63.

[41] *Id.* at 104.

[42] *Id.* at 98, 100.

[43] *Id.* at 100.

its summary judgment ruling because further discovery is needed. Such motions should be freely granted so long as the petitioning party has "diligently pursued discovery." *Beattie v. Madison County Sch. Dist.*, 254 F.3d 595, 606 (5th Cir. 2001) (noting that Rule 56(f) relief is precluded when the party has not diligently pursued discovery).

Mr. Callahan does not specifically ask this Court for Rule 56(f) relief. After arguing that this Court should deny both summary judgment motions, he alternatively requests more time for discovery. He does not explain why he has not taken any depositions in this case other than his own, despite receiving two continuances from this Court in order for him to obtain discovery. His Opposition merely states "the deposition phase from plaintiff's standpoint has not begun." The summary judgment motions were filed in March 2008. The plaintiff received two extensions of time, and did not file his Opposition until October 31, 2008. This Court finds that Mr. Callahan has not established that he has diligently pursued discovery such that Rule 56(f) relief is warranted.

## SUMMARY JUDGMENT STANDARD

A court should grant a motion for summary judgment when the file, including the opposing party's affidavits, demonstrates that "there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The party moving for summary judgment is initially responsible for demonstrating the reasons justifying the motion for summary judgment by identifying portions of pleadings and discovery that demonstrate the lack of a genuine issue of material fact for trial. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). "Furthermore, the party moving for summary judgment must 'demonstrate the absence of a genuine issue of material fact,' but need not *negate* the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 323). "If the moving party fails to meet this initial burden,

8

the motion must be denied, regardless of the nonmovant's response." *Id.*

If the movant, however, satisfies this burden, the nonmoving party must then "designate specific facts showing that there is a genuine issue for trial." *Tubacex,* 45 F.3d at 954. In evaluating motions for summary judgment, the court must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Ultimately, a grant of summary judgment is warranted when the record as a whole "could not lead a rational finder of fact to find for the non-moving party..." *Id.*

## THE LLOG MOTIONS FOR SUMMARY JUDGMENT [DOCS. 51 & 56]

### A.) Governing Law

Mr. Callahan brings suit pursuant to the Longshore and Harbor Worker's Compensation Act, 33 U.S.C. § 901, *et seq.* Specifically, Mr. Callahan brings suit against the LLOG entities in their capacities as the charterers of the MV/MS NANCY and the MV/OCEAN SPARTAN. Mr. Callahan's tort remedies are governed by § 905(b).

In *Hodgen v. Forest Oil Corp.,* the Fifth Circuit clarified the § 905(b) duty a time charterer owes to the passengers on its chartered vessels. 87 F.3d 1512, 1520 (5th Cir. 1996). "[A] time charterer owes a *Graham* duty, a hybrid duty arising from contract and tort, to persons with whom it has no contractual relationship, including vessel passengers, to avoid negligent actions within the sphere of activity over which it exercises at least partial control." *Id.* In *Graham v. Milky Way Barge, Inc.,* the Fifth Circuit articulated a time charterer's hybrid duty (a "*Graham*" duty). 824 F.2d 376, 388 (5th Cir. 1987). "[T]here is a distinction between a time charterer's potential liability under the time charter and independent tort liability which is not governed by the time charter. In addition, general principles of negligence govern maritime torts." *Id.* A time charterer's duty therefore stems from both the charter itself as well as independent principles of tort law. *Id.*

9

A time charterer traditionally exercises control, and thus owes a duty, in "choosing the vessel's cargo, route, and general mission, as well as the specific time in which the vessel will perform its assignment." *Hodgen*, 87 F.3d at 521. Accordingly, a time charterer may be liable for directing the vessel to encounter "treacherous seas," because the timing of the vessel's departure is traditionally within the time charterer's control. *Moore v. Phillips Petroleum Co.*, 912 F.2d 789, 792 (5th Cir. 1990) (finding the time charterer bore no liability for injuries a passenger sustained when the rope used to transfer from the vessel to the platform broke because the vessel owner controlled the means of ingress and egress, which are traditionally the vessel owner's responsibility).

A time charterer does not owe a duty beyond these traditional spheres, unless the parties have varied the traditional allocation of responsibility. *Hodgen*, 87 F.3d at 521. A time charterer may, however, alter the traditional assignment of control by contract or custom. *Id.* The *Hodgen* court concluded that it was proper to impose a duty on the time charterer where the passenger was injured "because the seas were too rough to make a swing rope transfer safely," since the time charterer had ordered the timing of the transfer and knew or should have known that the seas were too rough to make a swing rope transfer. *Id.* at 1520-21 (noting that nothing in the parties' contract altered the traditional allocation of control over the timing, and that the contractual control over the timing of the mission gave rise to the hybrid *Graham* duty).

A time charterer may also incur tort liability for the torts of its independent contractor, if the time charterer, acting as principal, exerts "operational control" over the independent contractor, or expressly or impliedly authorizes the independent contractor's actions. *Landry v. Huthnance Drilling Co.*, 889 F.2d 1469, 1471 (5th Cir. 1989).[44] "Under Louisiana law, a principal generally is

---

[44] A principal may also face liability for an independent contractor's acts when the independent contractor is engaged in ultrahazardous activities. *Graham v. Amoco Oil Co.*, 21 F.3d 643, 645 (5th Cir. 1994). As a matter of law, drilling is not an ultra-hazardous activity, and

not liable for the offenses an independent contractor commits in the course of performing contractual duties." *LeJeune v. Shell Oil Co.*, 950 F.2d 267, 270 (5th Cir. 1992) (quoting *Triplette v. Exxon Corp.*, 554 So.2d 1361, 1362 (La. App. 1st Cir. 1989)).

"The control determination depends in great measure upon whether and to what degree the right to control the work has been contractually reserved by the principal. The supervision and control which is *actually* exercised by the principal is less significant." *Ainsworth*, 829 F.2d at 550-51 (emphasis in original) (internal quotations omitted). The *Ainsworth* court concluded that the mere presence of a company man on the job site does not indicate liability, especially given that the contract stated that the principal shall retain no direction or control over the contractor, but is only interested in the "results to be obtained." *Id.* at 550.

### B.) Analysis

LLOG Exploration Company, LLC, LLOG Exploration and Production Company, and LLOG Exploration Texas LP move for summary judgment because they argue only LLOG Offshore acted as time charterer. LLOG Exploration Company, LLC, LLOG Exploration and Production Company, and LLOG Exploration Texas LP liken the blanket time charter agreement to a master service agreement, and thus maintain that only LLOG Offshore chartered the MS. NANCY. Mr. Callahan points out that all four LLOG entities appear on the time charter and all master service agreements. Because this Court ultimately concludes that LLOG Exploration Company, LLC, LLOG Exploration and Production Company, and LLOG Exploration Texas LP shall not incur liability even assuming they are time charterers, this Court need not reach the merits of this particular argument.

---

accordingly, this exception does not apply. *See Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 550 (5th Cir. 1987).

LLOG Offshore, which asserts that it was the sole time charterer of the M/V MS. NANCY and the OCEAN SPARTAN, moves for summary judgment because, pursuant to the blanket time charter agreements with C&G for the M/V MS. NANCY, the voyages each vessel performed was "subject to the sole right of [C&G] of the captain of each vessel to determine whether the movement may be safely undertaken, with the captain always being in charge."[45] LLOG Offshore further moves for summary judgment because it has no liability for the alleged offenses of an independent contractor.

Accordingly, this Court shall first examine the charter agreements to determine whether any LLOG entity can incur liability for Mr. Callahan's alleged injuries stemming from contractual liabilities. Next, this Court shall examine whether any LLOG entity exercised "operational control" over its independent contractors such that an LLOG entity can incur liability as a principal for the torts of its independent contractors.

### 1.) Time Charterer Liability

Mr. Callahan asserts that he was injured while aboard the M/V MS. NANCY awaiting transfer to the OCEAN SPARTAN when he fell due to rough seas. Under *Hodgen*, a time charterer can incur liability when the cause of harm is within the charterer's traditional sphere of responsibility. The timing of a transfer is within the charterer's traditional sphere of responsibility. Therefore, because Mr. Callahan asserts he was injured due to the timing of the transfer–because of the treacherous seas, and not during the actual ingress and egress–Mr. Callahan is asserting a claim for which the cause of harm is within the charterer's sphere of responsibility.

However, a time charterer may alter the traditional assignment of control by contract. *Hodgen*, 87 F.3d at 521. The LLOG entities argue that they "ceded all responsibility for determining

---

[45] Def.'s Ex. D-1 [doc. 56-7].

when and under what prevailing conditions the MS. NANCY should operate to the vessel master under the terms of the blanket time charter agreement."[46] Having reviewed the terms of the blanket time charter agreement, this Court agrees. Accordingly, this Court turns to whether any LLOG entity could incur liability for exercising "operational control" over its independent contractors.

### 2.) Independent Contractor Liability

LLOG's master service contracts with both EPS and Eagle clearly state that LLOG was "interested only in the results obtained" and would retain "no control over the manner and method of performance." The time charter agreement between the LLOG companies and C&G classified C&G as an independent contractor and assigned C&G the "sole right" to determine whether the vessel could be safely moved.

In his Opposition, Mr. Callahan summarily addresses the independent contractor argument by stating that "the vessels were negligently directed to transfer the plaintiff...one or more natural persons directed the vessel...and whoever those natural persons were, they were...the agents of the charterers,"[47] and fails to cite any relevant case law or provide any summary judgment evidence. Mr. Callahan asserts that whether "the persons operating on their behalf were their employees, agents, or independent contractors remains unclear."[48] Mr. Callahan states that alternatively, this Court should defer its ruling because there are several outstanding questions of fact, such as who decided to make the transfer, and a question of law–"if there was an independent contractor relationship, does such a relationship shield from liability under the law of maritime tort?"[49] As discussed *supra*, the

---

[46] Def.'s Reply [doc. 84], at 6.

[47] Pl.'s Opp. to Mot. For Summ. J. [doc. 91], at 31.

[48] Pl.'s Response to Def.'s Statement of Uncontested Material Facts ¶ 3 [doc. 91-9].

[49] *Id.* at 32.

plaintiff has had ample time for discovery and six months' worth of extensions in which to file his Opposition, this Court declines to further defer a ruling.

Under the principles articulated in *Ainsworth*, which stated that "[t]he control determination depends in great measure upon whether and to what degree the right to control the work has been contractually reserved by the principal," it is apparent that LLOG did not reserve any control in its contracts with EPS, Eagle, or C&G. Furthermore, even though "[t]he supervision and control which is *actually* exercised by the principal is less significant," here, LLOG Exploration Company, LLC, LLOG Exploration and Production Company, and LLOG Exploration Texas LP have presented competent and unrebutted summary judgment evidence that they did not actually exercise any supervision and control. *See Ainsworth*, 829 F.2d at 550-51.

LLOG Exploration Company, LLC, LLOG Exploration and Production Company, and LLOG Exploration Texas LP submit competent summary judgment evidence that demonstrates they were not involved with ordering the transfer. Mr. Callahan fails to present any summary judgment evidence to rebut the evidence presented by LLOG Exploration Company, LLC, LLOG Exploration and Production Company, and LLOG Exploration Texas LP, such that there is a genuine issue of fact for trial. At the summary judgment stage, mere allegations are insufficient. Because Mr. Callahan has not presented any summary judgment evidence that LLOG Exploration Company, LLC, LLOG Exploration and Production Company, and LLOG Exploration Texas LP retained operational control, such that liability could be conferred upon any of these entities as a principal, this Court GRANTS summary judgment in favor of LLOG Exploration Company, LLC, LLOG Exploration and Production Company, and LLOG Exploration Texas LP. LLOG's motion for summary judgment [doc. 48] is hereby GRANTED.

LLOG Offshore argues that it has no liability for the alleged offenses of its independent

contractors because it did not retain operational control over their actions, and because LLOG Offshore did not actually have any involvement in the decisions of April 10, 2005. As this Court discusses in greater detail *infra*, there is no negligence in this case because it is uncontested that it was not too dangerous to make a basket transfer. Accordingly, there is no genuine issue of material fact for trial as to LLOG Offshore's liability and [doc. 56] is hereby GRANTED.

## DIAMOND AND GULF LOGISTICS' MOTIONS FOR SUMMARY JUDGMENT [DOCS. 51 & 57]

### A.) Governing Law

This case arises pursuant to the Longshore and Harbor Worker's Compensation Act (hereinafter "LHWCA"), 33 U.S.C. § 901, *et seq*. The parties dispute the applicable standard. At the outset, this Court notes that there is no Fifth Circuit precedent establishing the applicable duty of care under the LHWCA to workers who are classified as longshoremen by virtue of being engaged in the production of oil and gas on the Outer Continental Shelf.

Both defendants assert that the standard articulated by the Supreme Court in *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156 (1981) applies. *Scindia* relieves a vessel owner of the automatic duty to inspect or supervise stevedoring operations, and places the primary responsibility for the longshoreman's safety on the stevedore and not the vessel owner. Thus, Gulf Logistics argues that Mr. Callahan must prove the defendants had a duty to intervene in his work operations,[50] the defendants breached their duty, and Mr. Callahan was harmed because of this breach. *See Scindia* (defining the vessel owner's duties as the turnover duty, the active control duty,

---

[50] Gulf Logistics argues that for a vessel to have a duty to intervene, "the vessel owner must (1) have actual knowledge of the hazard and (2) have reason to believe that the stevedore improvidently intends to work in the face of it. The...shipowner's responsibility under the third *Scindia* duty is 'narrow and requires something more than mere shipowner knowledge of a dangerous condition.'" *Pledger v. Phil Guilbeau Offshore, Inc.*, 2003 WL 2012382, at *5 (E.D. La. 05/01/2003).

and the duty to intervene).[51]

Mr. Callahan urges this Court to apply *Kermarec*'s "reasonable care under the circumstances" standard. In support of his argument, Mr. Callahan submits *Gallow v. Newfield Exploration Co., et al.*, where the court considered the relevant standard of care a vessel owner owes under the LHWCA to workers who are classified as longshoremen by virtue of being engaged in the production of oil and gas on the Outer Continental Shelf. Pl.'s Ex. E, 06-259 (W.D. La. 07/29/2008), pp. 9-18. The court specifically considered whether *Scindia* applies to "passengers injured on a vessel who are longshoreman, but not engaged in stevedoring services on the vessel." *Id.* After much analysis, the court concluded that *Scindia* does not apply to passengers injured on a vessel who are longshoreman, but not engaged in stevedoring services on the vessel. *Id.* at 14-17 (noting that *Ross v. John E. Graham & Sons*, 98-31364,1999 WL 511360 (5th Cir. 06/22/1999) (per curiam), although unpublished, lends further support to this conclusion).

Noting that "the Fifth Circuit, along with other circuits, has yet to clarify a precise standard to be employed in cases such as the instant case," the court chronicled the history of the LHWCA generally, and as it applies to workers who are classified as "longshoremen" by virtue of being engaged in the production of oil and gas on the Outer Continental Shelf. *Id.* Stating that "the jurisprudence has created, unnecessarily, a morass," as to what standard to apply to such persons, the court concluded that the appropriate standard is whether the vessel "employed reasonable care under the circumstances," which the Supreme Court articulated in *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959). *Id.* at 17.

Gulf Logistics submitted a Reply and a Response to Mr. Callahan's Sur-Reply, both of which

---

[51] Gulf Logistics notes that, based on Mr. Callahan's complaint, he alleges Gulf Logistics breached the duty to intervene.

strongly dispute the application of *Kermarec*'s "reasonable care under the circumstances" standard

that was adopted in *Gallow*. In particular, Gulf Logistics argues that *Gallow* misapplies the law by

relying on *Smith* as a LHWCA case. Gulf Logistics argues that *Smith* just received "compensation

benefits," and that it is unclear whether those were state or LHWCA benefits. Moreover, because

Congress did not enact 33 U.S.C. § 905(c), which expanded LHWCA coverage to shelf workers by

virtue of §905(b) until 1984, which was after the accident in *Smith* occurred.[52] Thus, Gulf Logistics

argues *Gallow* misapplies *Smith*.

This Court finds that the concerns raised by Gulf Logistics are unavailing. First, although

§ 905(c) was not added until 1984, the Outer Continental Shelf Lands Act was amended in 1978 to

make LHWCA applicable to shelf workers. 43 U.S.C. § 1333(b). Second, *Gallow*'s reasoning does

not "rest upon" the assumption that *Smith* was an LHWCA case. Third, in *Porter v. Gulf Tran, Inc.*,

Pl.'s Ex. E, 6:02-1453, p. 22 (W.D. La. 10/23/2003), the court considered whether Mr. Smith

recovered under the LHWCA and concluded that in all likelihood, he would have been working on

the Outer Continental Shelf as a longshoreman. Although *Porter* is unpublished and merely

persuasive, this Court agrees with the analysis contained therein, given the fact that the plaintiff in

*Smith* was a crane operator working on a fixed platform in the Gulf off of the Louisiana coast.

Furthermore, courts in the Western District of Louisiana have since applied *Kermarec*'s

"reasonable care under the circumstances" standard when evaluating a vessel owner's negligence

pursuant to § 905(b) when the plaintiff is a longshoreman by virtue of working on the Outer

Continental Shelf. *See, e.g., Parta v. Grand Isle Shipyard, Inc.*, 06-844, 2008 WL 5262728 (W.D.

La. 12/17/2008). Accordingly, in the absence of Fifth Circuit precedent to the contrary, this Court

---

[52] Although § 905(c) was not added until 1984, the Outer Continental Shelf Lands Act
was amended in 1978 to make LHWCA applicable to shelf workers. 43 U.S.C. § 1333(b).

is convinced by the reasoning articulated by Judge Doherty in *Gallow* and *Porter*, and shall also apply *Kermarec*'s "reasonable care under the circumstances" standard.

### B.) Analysis

The issue presented in both motions for summary judgment is whether the vessel owners' actions were "reasonable under the circumstances." In his Complaint, Mr. Callahan alleges that (1) the defendants transferred him in extremely hazardous weather conditions that made standing on the MS. NANCY dangerous; (2) the defendants directed him to leave the cabin of the MS. NANCY for the deck, where he was injured; (3) MS. NANCY failed to provide him with safe egress; (4) OCEAN SPARTAN failed to provide him with safe ingress.[53]

By Mr. Callahan's own admission, no one directed him to leave the cabin of the MS. NANCY, and accordingly, the defendants cannot be found negligent for directing Mr. Callahan to leave the cabin of the MS. NANCY for the deck. Mr. Callahan argues that the "seas" rendered the vessel unsafe.[54]

### 1.) Diamond's Motion for Summary Judgment

Diamond argues that summary judgment is appropriate under the *Scindia* standard, which this Court finds is not the applicable standard in this case. Nonetheless, Diamond argues that Mr. Callahan alone made the decision to enter onto the rear deck of the M/V MS. NANCY when the seas were rough.[55] Diamond notes that Mr. Callahan had the "unfettered liberty" to remain in the vessel's passenger compartment or defer making the personnel basket transfer until the seas calmed down. Diamond asserts that Mr. Callahan never communicated any objection or apprehension regarding

---

[53] Amended Compl. [doc. 33].

[54] *See* Def.'s Ex. A (Callahan Dep.), p. 105.

[55] *Id.* at 108-09.

the weather conditions on the M/V MS. NANCY to anyone affiliated with Diamond.[56]  Thus, Diamond argues that because it had no indication that Mr. Callahan would stand on the rear deck when he believed it to present a dangerous circumstance even though he had the liberty to remain in the passenger's compartment or defer making the transfer to the OCEAN SPARTAN, that, as a matter of law, Diamond cannot incur liability pursuant to §905(b).

Diamond's motion for summary judgment is granted because the summary judgment evidence is undisputed that Mr. Callahan did not believe the seas were too dangerous for work or to make the personnel basket transfer, and in fact, safely completed a personnel basket transfer after his injury.  Accordingly, this Court finds that Diamond has met its burden of proving it acted reasonably under the circumstances such that Diamond is entitled to judgment as a matter of law.

### 2.) Gulf Logistics' Motion for Summary Judgment

Gulf Logistics' original motion for summary judgment argues that it had no duty to intervene under *Scindia*, which is not the applicable standard in this case.  Accordingly, this Court cannot grant summary judgment for the reasons articulated in the original motion for summary judgment; however, this Court shall also consider the arguments presented by Gulf Logistics in its Reply arguing that summary judgment is warranted because it acted reasonably under the circumstances. In Reply, Gulf Logistics argues that it acted reasonably under the circumstances because no one, including the plaintiff himself, believed the seas were too dangerous for work or to make the personnel basket transfer.

Mr. Callahan objects to Gulf Logistics' motion.  He argues that sea conditions of fifteen to eighteen feet, without more, is sufficient to establish that Diamond breached its duty under § 905(b). Mr. Callahan argues that the wave height alone is sufficient, under *Hodgen v. Forest Oil Corp.*, 87

---

[56] Def.'s Mem. in Support of Mot. for Summ. J., at 16.

19

F.3d 1512 (5th Cir. 1996), *Porter v. GulfTran, Inc.*, Pl.'s Ex. E, 6:02-1453 (W.D. La. 10/23/2003), and *Williams v. McCall's Boat Rentals, Inc.*, 99-1769, 2002 WL 465170 (E.D. La. 03/26/2002) to establish that Gulf Logistics breached its duty.

First, Mr. Callahan states that it is "undisputed" that sea conditions reached fifteen to eighteen feet. This Court disagrees. Mr. Callahan's deposition testimony states that waves reached fifteen to eighteen feet; however, his accident report from April 10, 2005 states that the waves were ten (10) feet.[57]

Next, this Court considers the cases upon which Mr. Callahan relies. In *Hodgen*, the plaintiff was injured while performing a swing rope transfer. 87 F.3d 1512. The Fifth Circuit found wave heights of seven to nine feet to be too rough to conduct a swing rope transfer. *Id.* at 1521. Accordingly, the court found the vessel owner was negligent because the platform was not equipped with a personnel basket to offer an alternate route of transfer, and the vessel owner knew or should have known the seas were too choppy to attempt a swing rope transfer. *Id.*

In *Porter*, following a bench trial, Judge Doherty concluded that six foot seas ("borderline" weather conditions) made it difficult to hold that particular vessel to make a swing rope transfer. Pl.'s Ex. E, pp. 27-32. The court found the vessel was negligent, however, not for attempting the swing rope transfer, but for permitting a third person to attempt a swing rope transfer in borderline weather after two people had significant problems making their swing rope transfers. *Id.* at 35.

In *Williams*, following a bench trial, Judge Porteous concluded that the seas reached a height of over nine feet. A marine expert testified that seas greater than nine feet for a vessel the size of the M/V SAM MCCALL, are unsafe within which to sail. 2002 WL 465170, *2.

Thus, wave height alone, even if there were no issue as to the height of the waves, does not

---

[57] *See* Def.'s Ex. A (Callahan Dep.), p. 86-86, 138-40.

establish liability per se. In *Hodgen*, *Porter*, and *Williams*, the courts considered the vessel size and circumstances surrounding the injury, including marine expert testimony, in determining whether the defendants acted unreasonably given the circumstances. Furthermore, Mr. Callahan made a personnel basket transfer, not a swing rope transfer,[58] which Gulf Logistics notes is "considerably more dangerous than basket transfers." Thus, a wave height that is dangerous for a swing rope transfer may not be so for a personnel basket transfer.

Although Mr. Callahan also contends that the seas themselves made standing on the deck of MS. NANCY dangerous, Gulf Logistics correctly points out that Mr. Callahan did not believe the seas were too dangerous for work or to make the personnel basket transfer, and in fact, safely completed a personnel basket transfer after his injury. Gulf Logistics has therefore met its summary judgment burden of showing by competent summary judgment evidence there is no genuine issue of material fact and that it acted reasonably as a matter of law.

## CONCLUSION

Considering the evidence and applicable law, this Court concludes that the defendants have established that there is no issue of material fact that they performed their duty to act reasonably under the circumstances such that summary judgment is warranted. Moreover, and drawing all reasonable inferences in favor of the non-moving party, this Court concludes that there are not genuine issues of material fact warranting trial; accordingly,

IT IS ORDERED that Diamond's motion for summary judgment, [doc. 57], is hereby GRANTED;

IT IS FURTHER ORDERED that Gulf Logistics' motion for summary judgment, [doc. 51], is hereby GRANTED;

---

[58] *Id.* at 99.

IT IS FURTHER ORDERED that LLOG Offshore's motion for summary judgment, [doc. 56], is hereby GRANTED.

IT IS FURTHER ORDERED that LLOG's motion for summary judgment, [doc. 48], is hereby GRANTED.

Lake Charles, Louisiana, this __31__ day of __March__, 2009.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE