UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| CHRISTOPHER S. CALLAHAN | CIVIL ACTION NO. 06-00561 |
| VERSUS | JUDGE DONALD E. WALTER |
| GULF LOGISTICS LLC et al | MAG. JUDGE WHITEHURST |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came before the Court for a bench trial, beginning on October 23, 2017. At the close of evidence on the first day of trial, Plaintiff Christopher Callahan advised the Court that he had been fully heard on the issue of liability. The following morning, pursuant to Federal Rule of Civil Procedure 52(c), Defendants Gulf Logistics LLC, Gulf Logistics Operating, Inc., C & G Boats, Inc., and Houston Casualty Company argued in favor of a judgment on partial findings.[1] Upon due consideration of the facts and evidence presented at trial, together with the joint stipulations contained in the previously-adopted Pre-Trial Order [Doc. #235, pp. 17–18; Doc. #236, p. 2] and the arguments of the parties, the Court found that Plaintiff Callahan had failed to establish liability by a preponderance of the evidence and orally granted judgment in favor of all remaining defendants. In support thereof, the Court hereby makes the following findings of fact and conclusions of law, in accordance with Federal Rule of Civil Procedure 52(a) and (c).

This lawsuit was brought pursuant to § 905(b) of the Longshoremen's and Harbor

---

[1] Defendants C & G Boats, Inc., Gulf Logistics LLC, and Gulf Logistics Operating, Inc. were affiliated companies at the time C & G Boats chartered the crew boat M/V MS. NANCY to LLOG Exploration Company, LLC. For purposes of this ruling, the Court will refer to Gulf Logistics, LLC, Gulf Logistics Operations, Inc., and C & G Boats, Inc., collectively, as "Gulf Logistics."

Workers' Compensation Act, 33 U.S.C. § 901 *et seq*, made applicable to Plaintiff Callahan by the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333(b). *See Lormand v. Superior Oil Company*, 845 F.2d 536, 541 (5th Cir. 1987). Section 905(b) of the LHWCA permits a worker to recover from a vessel owner for personal injury "caused by the negligence of [the] vessel." 33 U.S.C. § 905(b); *Lormand*, 845 F.2d at 541. This Court has jurisdiction over Mr. Callahan's claim under its admiralty and maritime jurisdiction, 28 U.S.C. § 1333, and under 33 U.S.C. § 905(b) and (c), again, made applicable to Mr. Callahan by 43 U.S.C. § 1333(b).

To prevail on his maritime tort claim, Plaintiff Callahan was required to prove duty, breach, causation, and damages. *Canal Barge Co., Inc. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000); *see also Withhart v. Otto Candies, LLC*, 431 F.3d 840, 842 (5th Cir. 2005) ("The elements of a maritime negligence cause of action are essentially the same as land-based negligence under the common law."). All parties agree that Gulf Logistics owed Plaintiff Callahan a duty of reasonable care under the circumstances. *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 632 (1959). This included a "duty to warn passengers of reasonably anticipated dangers—though not openly obvious ones[.]" *Counts v. Lafayette Crewboats, Inc.*, 622 F. Supp. 299, 301 (W.D. La. 1983). Plaintiff Callahan was also required to "exercise reasonable care and prudence, and since the vessel owner is not an absolute insurer of the passenger's safety, if the passenger is injured absent vessel owner negligence, no recovery is mandated." *Lavergne v. Chevron U.S.A., Inc.*, 782 F. Supp. 1163, 1168 (W.D. La. 1991) (citing *Counts*, 622 F. Supp. at 301)).

At all relevant times, Plaintiff Callahan was employed as a field service technician by Cameron International Corporation, f/k/a Cooper Cameron Corporation, and was performing

duties within the course and scope of his employment therewith. [Doc. #237, p. 1]. Likewise, at all relevant times, the crew boat *M/V MS. NANCY* was owned by Gulf Logistics LLC and crewed by employees of Gulf Logistics Operating, Inc. On April 10, 2005, Plaintiff Callahan boarded the *M/V MS. NANCY* in Berwick, Louisiana, as a passenger for a three and one-half (3.5) hour voyage to the *Ocean Spartan*, a mobile drilling unit located in South Marsh Island Block 102. It is undisputed that the *M/V MS. NANCY* was on location at the *Ocean Spartan* for approximately forty-five (45) minutes, from 9:30 p.m. to 10:15 p.m., on April 10, 2005.

Plaintiff's meteorological expert, Dr. Marshall D. Earle, Ph.D., testified regarding the relevant weather and wave conditions, which he determined by studying data from Buoy No. 42038. During the time that the *M/V MS. NANCY* was on location at the *Ocean Spartan*, it is undisputed that the significant wave height, defined as the average of the highest one-third (1/3) of waves, was 7.8 feet. The average wave height of the remaining two-thirds (2/3) of the waves was 3.44 feet, while the average of all waves was 4.91 feet. Dr. Earle further testified that, during the forty-five (45) minutes in question, approximately 50 total waves would have been in the highest one-tenth (1/10) of waves, for which the average was ten (10) feet. During that same time frame, Dr. Earle explained that he was 90% certain that one wave occurred that measured between thirteen and seventeen (13 – 17) feet high. Significant wave height is the metric commonly used to describe the height of the seas on any given day; neither the National Data Buoy Center, the National Weather Service, nor the National Oceanic and Atmospheric Administration include maximum wave height in their standard meteorological data.

Both Captain Douglas Gibbs and Captain Ronald L. Campana testified at trial. Captain Gibbs was the captain and operator of the *M/V MS. NANCY* on the night in question, while

3

Captain Campana is a retired boat captain offering expert testimony in this trial. While Captain Gibbs had no recollection as to whether he did or did not check weather reports on April 10, 2005, he testified that he does not habitually check the weather but rather determines whether given seas are suitable based on his assessment of his ability to safely and successfully complete the assignment or operation. Captain Gibbs testified that he has never seen seas of 15–18 feet. Although Captain Campana testified that boat captains should always be aware of current weather reports, he conceded that the specific movement of the *M/V MS. NANCY* which caused Plaintiff's injury was a "sharp roll," caused solely by the sea and beyond the captain's control. Likewise, although Captain Campana criticized Captain Gibbs' failure to conduct a job safety analysis with Callahan, Campana conceded that 46 C.F.R. 185.506 does not require that a captain discuss "any and all dangers." Captain Campana further testified that neither rain nor darkness, conditions present during the relevant time period, would make maneuvering the *M/V MS. NANCY* any more difficult than it might otherwise be under different conditions.

Upon arrival at the *Ocean Spartan*, Plaintiff Callahan, who had been sleeping in the passenger cabin, was awakened by a deckhand. As previously recognized by the Fifth Circuit, it is undisputed that Plaintiff Callahan was never explicitly instructed to leave the cabin of the ship. *Callahan v. Gulf Logistics, L.L.C.*, 456 F. App'x 385, 393 (5th Cir. 2011). In fact, no one directed him one way or another as to whether he should exit the passenger cabin or remain inside. Plaintiff Callahan testified that the deckhand's decision to leave the cabin door open signaled to Callahan that he could exit the cabin.

Prior to exiting the cabin, Plaintiff Callahan decided to place his belongings, including a 35-pound bag, just outside the cabin door, in the area referred to during trial as the "patio." After

4

exiting the cabin but prior to his injury, Plaintiff Callahan and the deckhand each smoked a cigarette together on the patio. While standing on the patio, Plaintiff Callahan testified to having observed one 15-foot wave strike the leg of the *Ocean Spartan*. He was also in a position to observe the cargo operations and the relative difficulty involved in the roustabouts and deckhands performing their work, transferring equipment between the *M/V MS. NANCY* and the *Ocean Spartan*. At some point, without being instructed to do so and before the personnel basket was even secured on the *M/V MS. NANCY* in preparation for his transfer, Plaintiff Callahan decided to lift his 35-pound bag in an effort to put it on his shoulder. This movement coincided with a sharp roll from the *M/V MS. NANCY*, causing Plaintiff Callahan to be thrust forward and to sustain the relevant back injury. Plaintiff Callahan then caught his breath, while leaning on the "headache rack," and waited outside of the passenger cabin until it was time to transfer to the *Ocean Spartan.* Ultimately, Plaintiff Callahan successfully made the personnel basket transfer from the *M/V MS. NANCY* to the *Ocean Spartan*, at which time he reported his injury and requested that another technician be sent to relieve him of his duties.

Plaintiff Callahan is an experienced service technician who has completed hundreds of transfers from crew boats to other structures via personnel baskets. At trial, Plaintiff Callahan confirmed that he was aware of the risks involved in making the personnel basket transfer and decided to accept same, without having any discussions with anyone on board regarding the safety of making the transfer. At all times relevant, Plaintiff Callahan knew that he had "stop work" authority, which he had exercised in the past without adverse consequences, but declined to exercise that authority on April 10, 2005.

As recognized by the Fifth Circuit, "the question whether an alleged tortfeasor exercised

5

reasonable care under the circumstances is appropriately left for the [factfinder] to decide." *Callahan*, 456 F. App'x at 391. Having had the opportunity to listen to and observe the witnesses at trial, this Court believes Plaintiff Callahan's testimony insofar as he suffered an injury at the moment it is alleged to have occurred but otherwise finds his testimony incredible.

Although counsel for both the plaintiff and the defendants argued in favor of a categorical or bright-line rule for determining liability (or lack thereof) based on a particular wave height, the relevant case law makes clear that the condition of the sea is merely one of several factors for the Court to consider. Indeed, many maritime negligence cases fail to even mention the height of the seas, much less rely solely thereupon in determining liability. *See e.g. Lavergne*, 782 F. Supp. at 1168 (citing *Smith v. Chevron Oil Co.*, 517 F.2d 1154 (5th Cir.1975), and *Moore v. Phillips Petroleum, et al.*, 698 F. Supp. 105 (E.D. La.1983)); *see also Bonin v. Ryan Marine Services, Inc.,* 412 F. App'x 724 (5th Cir. 2011) (noting "heavy" seas and "dangerous conditions," without mentioning wave height, in a Jones Act case).

The Court finds that the conditions that existed on the night of April 10, 2005, were neither unusually unsafe nor particularly hazardous. *See e.g. Counts*, 622 F. Supp. at 300 ("The seas that day were 'choppy' and the waves were running six to eight feet[;] [h]owever, no particular hazard existed."); *Lavergne*, 782 F. Supp. at 1169 (finding that 4 to 8 foot seas presented no particular hazard). The following facts combine to support this finding: neither Plaintiff Callahan nor any other roustabout or deckhand exercised "stop work" authority on April 10, 2005; the roustabouts successfully transferred themselves, as well as five pieces of equipment between the *M/V MS. NANCY* and the *Ocean Spartan*; and, the plaintiff himself ultimately made a successful transfer via personnel basket. Plaintiff Callahan's own expert,

Captain Campana, testified that Callahan could have exercised "stop work" authority if he did not want to make the transfer. Although Captain Campana attempted to differentiate the movements of the roustabouts from those of this plaintiff, the fact remains that the injury occurred in the area immediately outside the cabin door, when Plaintiff Callahan picked up his 35-pound bag at the exact time that the vessel made a "sharp roll" in response to a wave. Regardless of any decisions made, precautions taken or job safety analyses that could have been conducted by Captain Gibbs, Plaintiff Callahan would still have had to physically move his body from the cabin door to the point of egress where he was to mount the personnel basket and transfer to the *Ocean Spartan*.

For the foregoing reasons, the Court finds no fault on anyone's part and therefore no liability on behalf of any defendant. Plaintiff Callahan's claims for personal injuries and other losses are denied; therefore, the complaint in intervention [Doc. #157] filed by Cameron International Corporation and Liberty Mutual Insurance Company must also be dismissed.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this 15th day of November, 2017.

_____
DONALD E. WALTER
UNITED STATES DISTRICT JUDGE